IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHRISTOPHER P. DOWNEY,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀1:14-cv-1503 (LMB/TCB)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
UNITED STATES DEPARTMENT OF THE⠀⠀)
⠀⠀ARMY, and JOHN M. McHUGH, Secretary⠀)
⠀⠀of the United States Department of the Army,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

## MEMORANDUM OPINION

Following an incident that occurred during a military ball in April 2012, plaintiff

Lieutenant Colonel Christopher P. Downey ("Downey" or "plaintiff") was charged with three

violations of the Uniform Code of Military Justice ("UCMJ"). Downey's superior officer, two-

star Major General Mark Milley ("Milley"), held an administrative hearing known as an "Article

15," after which he found Downey guilty of one of the three charges—assault consummated by a

battery. The only punishment Downey received as a direct result of this finding of guilt was that

the record of the Article 15 was placed in the restricted section of his personnel file. He also

experienced certain adverse administrative actions affecting his career in the Army.

After an unsuccessful intermediate appeal, Downey appealed his Article 15 to the Army

Board for Correction of Military Records ("ABCMR" or the "Board"), which denied his appeal.

Downey filed the instant four-count action challenging the ABCMR's decision; the Article 15

proceeding; and various regulations, policies, and procedures of the defendants. The parties have

filed cross-motions for summary judgment on Counts I and II, and defendants have filed a

motion to dismiss Counts III and IV. The motions have been fully briefed and oral argument has

been held.  For the reasons that follow, defendants' motions will be granted and plaintiff's
motion will be denied.

## I.   BACKGROUND

### A.  __Factual Background__[1]

On April 14, 2012, a formal squadron ball was held on the base of Fort Drum, New York.
AR 330.  At that time, Downey was serving as the commander of the 6th Squadron, 6th Calvary,
10th Combat Aviation Brigade at Fort Drum, AR 330, 336, and was the commanding officer at
the ball, AR 91.  Between roughly 11:00 p.m. and midnight, Chief Warrant Officer Aaron
Simbro ("Simbro") alerted Downey to what he thought appeared to be a crowd gathering around
the dance floor and photographing a lesbian couple, Captain Katherine Robinson ("Robinson")
and Second Lieutenant Heather Parsons ("Parsons"), who were dancing and possibly engaging in
an inappropriate public display of affection.  AR 218, 330.  Downey quickly made his way
towards the couple and, in the process, he reached out and open-handedly attempted to push
down the cameras of two soldiers in his path whom he thought were photographing the couple.
AR 218, 330-31, 414, 611.  One of those individuals, Specialist Jeremy Reuter ("Reuter"), was
sufficiently pushed off balance from the force of Downey's thrust to wind up lying prone on the
floor.  AR 218, 224, 330-31.  It is undisputed that Reuter's nose was cut when the camera hit his
face.  AR 415, 611.  Downey's intention in attempting to push down the cameras had been to
stop any further photographing of the couple.  AR 218, 333, 611.  After his impact with Reuter,
Downey reached the lesbian couple and briefly told them to alter their behavior.  AR 218, 332.
He then stepped off the dance floor without waiting to determine whether his order had been
followed and began explaining the situation to Captain Thomas Jones, who had witnessed the

---

[1] The facts in this Opinion are taken from the administrative record, which is cited as "AR ___."

incident and asked what happened. AR 331-32. After Downey explained that he thought Reuter

had been taking inappropriate pictures of Robinson and Parsons, Jones immediately retrieved

Reuter's camera and reviewed the last 20 to 30 photographs; however, he found none of them

captured inappropriate conduct and most of them were actually of Jones and his wife, Captain

Samantha Jones, as they had asked Reuter to photograph them as they were dancing. AR 225,

331.

By this time, Captain Samantha Jones and some others had moved Reuter outside of the

hall where they observed his nose starting to swell. AR 225, 331, 415-16, 611. Downey left the

hall and met Reuter and the others, apologizing to Reuter and explaining that he had not intended

to injure Reuter; rather, he had only meant to prevent potentially inappropriate photographs of

Robinson and Parsons from being published on social media without their permission. AR 331.

Afterwards, Reuter was taken to the emergency room, where he was preliminarily diagnosed

with a fractured nose and a concussion. AR 331, 409-10. He was released and returned home

around 4:30 a.m. AR 331.

Shortly after Downey left the ballroom, an altercation arose on the dance floor between

Robinson and Command Sergeant Major Patrick McGuire ("McGuire"). AR 332. According to

Robinson and Parsons, McGuire called Robinson an "abomination," stated that their actions were

against regulations, and referenced the Don't Ask, Don't Tell policy ("DADT"). Id. Robinson

responded that DADT had been repealed months earlier, in September. AR 373. Their heated

exchange escalated until finally McGuire shoved Robinson with enough force to move her

backwards and to make an audible "thump" when his hands made contact with her body. AR

332, 334.

After apologizing to Reuter, Downey returned to the ballroom to check on Robinson and

Parsons, but neither of them mentioned the altercation with McGuire. AR 611. Downey found

out about that altercation the following day. AR 333, 611. Between his arrival at the ball at 5:00

p.m. and the beginning of the relevant events around 11:00 p.m., Downey had consumed six

alcoholic beverages. AR 219, 611. Reuter had also consumed five or six alcoholic drinks by the

time the incident with Downey occurred. AR 404-05.

**B.**   **Article 15 Investigation, Charges, and Hearing**

Four days after the events at the ball, on April 18, 2012, Downey's superior officer,

Milley, appointed Colonel Paul Schlimm ("Schlimm") to investigate what happened at the ball.

AR 330, 336. On April 23, Milley suspended Downey from duty and issued a "no contact" order

preventing him from having any contact with members of his unit. Am. Compl. ¶ 91. Schlimm

conducted an extensive investigation during which he obtained the sworn testimony or

statements of 34 witnesses to the events at the ball, including statements from Downey, Reuter,

Robinson, Parsons, and Simbro. AR 309-14, 332. Schlimm also interviewed all the wait staff on

duty during the ball, although none saw the incident at issue. AR 523-24. In addition to

investigating the incident between Downey and Reuter, Schlimm also inquired into the

subsequent incident between McGuire and Robinson, as well as the alcohol situation at the ball

and the implementation of DADT in Downey's unit. AR 332, 334-36. Among the hundreds of

pages of documentation gathered by Schlimm during his investigation, see AR 309-629, was the

preliminary diagnosis that Reuter had suffered a concussion and fractured nose, which was

reflected on his "After Care Instructions" from the hospital, AR 409-11. These instructions

summarized the symptoms typically associated with such injuries; advised on how to manage

those symptoms, including using ice to reduce nasal swelling; directed Reuter to follow up with

his unit's physician assistant, Justin Overholt, on Monday, April 16, 2012; and explained that

4

Reuter would be notified if the radiologist's final report on Reuter's x-rays differed significantly from the preliminary report and diagnosis. AR 410.

After completing his investigation, Schlimm presented his report to Milley on May 4, 2012, recommending, among other things, that Downey "receive an Article 15 for the offense of assault consummated by a battery and be relieved from command." AR 336. A deputy staff judge advocate reviewed Schlimm's investigation report and found that "the Report complies with legal requirements, the evidence supports the findings and the recommendations are consistent with the findings. The Report is legally sufficient." AR 337.

Downey was advised that Milley was considering whether Downey should receive punishment for three offenses: (1) assault consummated by a battery, (2) disorderly conduct, and (3) obstruction of justice.[2] AR 59. The same form advising him of these charges, the DA Form 2627,[3] also advised him of his rights under an Article 15 proceeding and his "right to demand trial by court-martial" if he did not want the charges disposed of under Article 15.[4] AR 59. An

---

[2] The obstruction of justice charge was based on Downey's suggestion to Robinson, the day after the ball, that she wait to go to the military police with her accusations against McGuire until an in-unit investigation could be conducted. AR 334, 374. Downey also allegedly told her that if she reported the incident to the military police, it would adversely affect his career. AR 333.

[3] The DA Form 2627 is the official record of the entire Article 15 proceeding. It contains the offenses charged, informs the accused of the right to proceed to trial by court-martial, provides the location of an appointed attorney with whom the accused may consult in deciding whether to waive a court-martial proceeding, states the outcome of the Article 15 hearing (if the accused chose to waive trial by court-martial), indicates the punishment dealt (if any), and includes the outcome of any appeal.

[4] The UCMJ actually "provides four methods of disposing of cases involving offenses committed by servicemen: the general, special, and summary courts-martial, and disciplinary punishment administered by the commanding officer pursuant to Art[icle] 15 [of the] UCMJ, 10 U.S.C. § 815." Middendorf v. Henry, 425 U.S. 25, 31 (1976). The methods vary in both procedural protections afforded and in the seriousness of the possible punishments that may result. See id. Of the four methods, non-judicial proceedings under Article 15 are the least formal; they constitute an "administrative method of dealing with the most minor offenses" and are "conducted personally by the accused's commanding officer." Id. at 31-32.

Article 15 proceeding is a non-adversarial, summary proceeding at which a commanding officer may impose discipline on his subordinates "for minor offenses without the intervention of a court-martial." 10 U.S.C. § 815(b). Because the proceeding, by design, offers soldiers only minimal procedural protections, the UCMJ grants all service-members the option to refuse an Article 15 proceeding and to demand an adversarial court-martial, which offers a much fuller range of protections but also carries the risk of much more severe punishments. Due to the consequences of choosing to waive court-martial protections, a soldier is entitled to consult with counsel, free of charge, before making the decision. Fairchild v. Lehman, 814 F.2d 1555 (Fed. Cir. 1987). Downey—who was himself authorized to administer Article 15 non-judicial punishment to his own subordinates—was given this choice and counseled on this choice by an attorney provided free of charge by the Army. After consulting with counsel, Downey elected to accept the Article 15 proceeding.[5]

The Article 15 hearing took place on May 30, 2012. Am. Compl. ¶ 151. Because a non-judicial proceeding is non-adversarial, a soldier does not have a right to counsel during the proceeding, cf. Middendorf v. Henry, 425 U.S. 25, 40, 45-48 (1976); however, a soldier does have the right to bring a spokesperson—who, at the soldier's option, may be an attorney—to the Article 15 proceeding. Army Reg. 27-10 ¶ 3-18(h) (Oct. 3, 2011). Here, Downey's military attorney, who had counseled him during the waiver phase, allegedly informed Downey that although she could act as his spokesperson, it would make him "appear weak." Am. Compl.

---

[5] Downey alleges he "initially informed his military attorney that he wanted to proceed with a court-martial instead of submitting to non-judicial punishment under Article 15;" however, he alleges that "[h]is attorney informed him that if he chose to do so, he would have to hire a civilian lawyer and would have to pay for those services." Am. Compl. ¶¶ 144-45. Based in part on that information, he agreed to proceed with the Article 15 hearing. Am. Compl. ¶ 146. At oral argument, defense counsel clarified that there is in fact a right to appointed counsel during a trial by court-martial. Regardless, Downey has not claimed that his waiver of a court-martial was rendered invalid by his reliance on this inaccurate information.

¶ 150.  She allegedly also told Downey that she had spoken with the Command Staff Judge

Advocate and he informed her that the hearing would merely be a "commanders' conversation."

Id.  Accordingly, Downey chose to proceed in the Article 15 hearing without a spokesperson.

Non-judicial proceedings are conducted largely at the direction of the imposing

commander who determines, for example, whether the soldier or the spokesperson may examine

or cross-examine witnesses and what witnesses are reasonably available for the proceeding.

Army Reg. 27-10 ¶ 3-18(h) (Oct. 3, 2011).  Formal rules of evidence do not apply, and the

commander may consider any evidence he reasonably believes to be relevant to the charges at

issue.  Id. ¶ 3-18(j).  After considering all of the evidence, the commander may only find the

soldier guilty if he is convinced beyond a reasonable doubt that the soldier committed the offense

charged.  Id. ¶ 3-18(*l*).

Following a five-hour hearing, Milley adjudicated Downey guilty of assault

consummated by a battery but sentenced him to no punishment.  Am. Compl. ¶ 151; AR 59-60.

Pursuant to Army regulations, a copy of the Article 15 record was placed in Downey's military

personnel file, but only in the restricted section.  Army Reg. 27-10 ¶ 3-37 (Oct. 3, 2011).  The

disorderly conduct charge was dismissed and Downey was found not guilty of obstruction of

justice.  AR 59.  Through counsel,[6] Downey appealed that decision to the next superior authority,

the Army Forces Command ("FORSCOM"), which denied his appeal on June 29, 2012, after a

reviewing judge advocate found that the "proceedings were conducted in accordance with law

and regulation and the punishments imposed were not unjust nor disproportionate to the offense

committed."  AR 60.

---

[6] Downey's counsel for his appeal to the Army Forces Command was Tory J. Langemo of
Gagne, Scherer & Langemo LLC, a self-described firm of "Military Trial Attorneys."  AR 305-
06.

## C. <u>Collateral Consequences</u>

On June 4, 2012, the same day the Article 15 decision was issued, Milley imposed an administrative reprimand (General Officer Memorandum of Reprimand or "GOMOR") on Downey for violating the repeal of DADT by "wrongfully and unfairly singl[ing] out a same sex couple for kissing and dancing together at the Squadron Ball." AR 12.

Also on June 4, 2012, Milley relieved Downey of his command pursuant to the regulation permitting such decisions when a superior commander "loses confidence in a subordinate commander's ability to command due to misconduct, poor judgment, the subordinate's ability to complete assigned duties, or for other similar reasons [including the performance of an informal investigation under Army Reg. 15-6]." Army Reg. 600-20 ¶ 2-17 (Mar. 18, 2008).[7] When an officer is relieved from command for cause,[8] the relieved officer's supervisors must prepare a "relief for cause" Officer Evaluation Report ("OER"). Army Reg. 623-3 ¶ 3-58 (Aug. 10, 2007).

---

[7] More specifically, this regulation provides:

> a. When a senior commander loses confidence in a subordinate commander's ability to command due to misconduct, poor judgment, the subordinate's inability to complete assigned duties, or for other similar reasons, the senior commander has the authority to relieve the subordinate commander. . . . [F]inal action to relieve an officer from any command will not be taken until after written approval by the first general officer (to include one frocked to the grade of brigadier general) in the chain of command of the officer being relieved is obtained. . . . [Army Reg.] 623-3 concerning administrative review of relief reports remain applicable.
>
> b. If a relief for cause is contemplated on the basis of an informal investigation under [Army Reg.] 15-6, the referral and comment procedures of that regulation must be followed before initiating or directing the relief. . . .

Army Reg. 600-20 ¶ 2-17 (Mar. 18, 2008).

[8] "Relief for cause is defined as an early release of an officer from a specific duty or assignment directed by superior authority and based on a decision that the officer has failed in their performance of duty. In this regard, duty performance will consist of the completion of assigned tasks in a competent manner and compliance at all times with the accepted professional officer standards shown in DA Form 67-9, Part IV. These standards will apply to conduct both on and off duty." Army Reg. 623-3 ¶ 3-58 (Aug. 10, 2007).

Completed OERs are placed in the performance section of the officer's personnel file.  Army

Reg. 600-8-104, Table 3-1 (Apr. 7, 2014).  After the OER is posted to a soldier's file, it is

presumed to be administratively correct and to represent the "considered opinion and objective

judgment of the rating officials at the time of preparation."  Army Reg. 623-3 ¶ 3-39(a) (Aug. 10,

2007).  A soldier may appeal any report that he believes to be inaccurate or prepared in violation

of regulations.  Id. ¶ 6-7(c).  If an officer seeks to appeal an adverse OER, he must file that

appeal with the appropriate Army Special Review Board ("ASRB").  Id. ¶¶ 6-7(i), 6-12.  Only

after a soldier submits an unsuccessful appeal to the ASRB may he then apply to the ABCMR to

correct the allegedly incorrect OER.  Id. ¶ 6-9(f).  In Downey's case, his relief for cause OER

covered his performance from October 2011 through June 2012.  In his OER, Milley wrote:

> LTC Chris Downey was relieved for cause of his Squadron Command due to a
> terrible mistake in judgement [sic] he made during a unit social event which
> resulted in my loss of confidence in him as a commander.  Although a very severe
> lapse in judgement [sic] by Chris, I firmly believe this was a one-time mistake on
> his part and he is an otherwise quality officer who still retains potential for
> continued service to our Army. . . . Although I relieved Chris, there is no doubt in
> my mind that he is a fully qualified officer and should retain his rank of
> [Lieutenant Colonel] and continue contributing to our Army.

AR 6 (signed by Milley in August 2012).

On July 19, 2012, an administrative elimination board was convened to determine

whether Downey should be separated from the Army based on the derogatory activity reported in

his relief for cause OER.  AR 40-44.  That board found that the allegations of derogatory activity

and of conduct unbecoming an officer were not supported by a preponderance of the evidence.

AR 44.  Accordingly, the board recommended that Downey be retained on active duty, a

decision consistent with Milley's conclusion.  AR 44, 55.  This decision did not result in

Downey being reinstated to his command position; it merely permitted him to remain in the

Army.

Downey suffered other consequences, including being removed from the National War College attendance list, being repeatedly passed over for promotion, and being put on a list to be considered for early retirement, as a result of the Article 15 and relief for cause OER. By order of the Secretary, a Selective Early Retirement Board ("SERB") convened on November 12, 2014, to recommend a certain number of lieutenant colonels for early retirement. See generally 10 U.S.C. §§ 638, 3911; U.S. Army Military Personnel Message 14-205. Although Downey was notified that he was among the officers the SERB would be considering for early retirement, Am. Compl. ¶ 223, the SERB has now submitted, and the Secretary has reviewed and approved, the final "early retirement" list and Downey was not among those selected. See 10 U.S.C. § 638. Downey maintains that he will likely be considered again for early retirement as long as the Article 15 and relief for cause OER remain in his file.

### D. ABCMR Decision

On August 16, 2013, Downey, through counsel, petitioned the ABCMR, which is the highest level of administrative review in the Army, to remove the Article 15 record from his personnel file on the ground that such removal was "necessary to correct an error or remove an injustice."[9] 10 U.S.C. § 1552(a)(1). During this appeal, Downey had both civilian and military counsel representing him.[10] AR 203-04.

Before the ABCMR, Downey focused on an x-ray report showing that it was later determined that Reuter's nose had not actually been fractured. See Pl.'s Opp'n to Defs.' Mots.

---

[9] Downey had initially submitted his request for removal of the Article 15 to the Department of the Army Suitability Evaluation Board, a lower-level administrative board within the Army that generally possesses jurisdiction over unfavorable personnel records; however, that board informed him that it did not have the authority to remove an Article 15 and that, instead, he needed to petition the ABCMR directly. AR 255.

[10] Richard Thompson of the Thomas More Law Center was Downey's civilian counsel before the Board and continues to represent Downey in this litigation.

and Cross-Mot. Summ. J. ("Pl.'s Opp'n"), Ex. 1 [Dkt. No. 36]. Downey discovered this report after his Article 15 and presented it to the ABCMR as part of his application for relief. Am. Compl. ¶ 129. Nevertheless, the Board concluded that the record evidence demonstrated that Downey had committed an assault consummated by a battery in violation of the UCMJ by unlawfully striking Reuter "on his face with a camera which he pushed into his face."[11] AR 27-28. Additionally, the ABCMR found that "the fact that members of [an] administrative separation board found the allegations of derogatory activity resulting in the referred OER and the allegations of conduct unbecoming an officer were not supported by a preponderance of the evidence does not mean that the imposing officer . . .—the person with the UCMJ authority—erred. . . . These are two separate actions and one does not negate the other." AR 28. The Board issued its final decision denying Downey's request on October 21, 2013, after concluding that the Article 15 was conducted in accordance with the law and regulations and that there was no evidence in the record to establish that the Article 15 was untrue or unjust. AR 28.

On November 27, 2013, Downey submitted additional documentation to the ABCMR, and requested that the ABCMR remove the relief for cause OER from his personnel file. AR 3-18. By letter dated December 23, 2013, the ABCMR responded, stating that it could not treat the

---

[11] There is some dispute between the parties as to whether the relevant x-ray report was actually submitted to the ABCMR. The only x-ray report in the record describes a "cervical spine" x-ray series and concludes that Reuter's spine was not fractured. AR 100. Downey insists he also submitted a second x-ray report regarding a "facial bone" x-ray series, which concluded that Reuter's nose and facial bones were not fractured. See Am. Compl. ¶¶ 128-29; Pl.'s Opp'n, Ex. 1. Defendants confirmed with the ABCMR that it was not in possession of any additional documents not in the administrative record. See Defs.' Opp'n to Pl.'s Cross Mot. Summ. J. 8 n.4 [Dkt. No. 37]. For the purpose of this Opinion, the Court assumes as true Downey's assertion that he submitted both x-ray reports to the Board. The Board considered Downey's written statement in support of his application, which was prepared with the assistance of counsel, as well as his attorney's memorandum, both of which stressed the significance of the fact that Reuter's nose was not fractured. See AR 22, 34, 65-66, 93. The Board's ultimate decision did not turn on the severity level of Reuter's injury. AR 27-28.

OER as an additional issue in his original ABCMR proceeding because that proceeding had been closed in October 2013.  The ABCMR further informed Downey that he could not apply to the ABCMR for relief regarding the relief for cause OER until he exhausted his administrative remedies by presenting his request to the Department of the Army Suitability Evaluation Board or appropriate ASRB.  AR 1-2; see also Army Reg. 623-3 ¶ 6-7(i) (Aug. 10, 2007).

### E.  Procedural Posture

Following his unsuccessful appeal to the ABCMR, Downey filed this lawsuit.  His Amended Complaint contains four counts:

| | |
|---|---|
| **Count I -** | "The ABCMR's decision was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise contrary to law." |
| **Count II -** | "The ABCMR's decision was contrary to applicable regulations and violated plaintiff's constitutional right to due process." |
| **Count III -** | "Defendants' actions have deprived plaintiff of his constitutional right to due process." |
| **Count IV -** | "Defendants' regulations, policies, and procedures have deprived plaintiff of his constitutional right to due process." |

Plaintiff seeks reversal of the ABCMR's decision and a declaration that the defendants violated plaintiff's fundamental rights, as well as an order:  enjoining defendants from instituting separation proceedings against plaintiff pending the outcome of this action, directing defendants to remove the Article 15 and the relief for cause Officer Evaluation Report from plaintiff's personnel file, and requiring the ABCMR to restore plaintiff to the position he would have had absent the wrongful findings.  Alternatively, plaintiff seeks an order directing a Special Selection Board to convene to restore plaintiff to the position he held before the events underlying his claims.  Lastly, he seeks an award of reasonable attorneys' fees and costs under the Equal Access to Justice Act.  Each party has moved for summary judgment on Counts I and II.  Defendants

have also moved for the dismissal of Counts III and IV for failure to state a claim upon which relief can be granted.

## II.   CROSS-MOTIONS FOR SUMMARY JUDGMENT ON COUNTS I AND II

Counts I and II state claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. Defendants contend that the ABCMR's decision satisfies the standards set forth in the APA and should therefore be upheld. Plaintiff responds that the Board's decision should be reversed as arbitrary, capricious, and unsupported by substantial evidence.

### A. Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Decisions of the ABCMR are final agency actions subject to judicial review under the APA. Cf. Chappell v. Wallace, 462 U.S. 296, 303 (1983). The APA "confines judicial review of executive branch decisions to the administrative record of proceedings before the pertinent agency. As such, there can be no genuine issue of material fact in an APA action . . . ." Shipbuilders Council of Am. v. U.S. Dep't of Homeland Sec., 770 F. Supp. 2d 793, 802 (E.D. Va. 2011) (citations omitted). In such actions, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Id. (internal quotation marks omitted).

For an ABCMR decision to be found invalid under the APA, the decision must be "arbitrary, capricious, contrary to law, or unsupported by substantial evidence," Portner v. McHugh, 395 F. App'x 991, 992 (4th Cir. 2010) (per curiam); Randall v. United States, 95 F.3d 339, 348 (4th Cir. 1996); 5 U.S.C. § 706(2)(A), (E), or "contrary to constitutional right, power, or privilege," 5 U.S.C. § 706(2)(B). "In determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and

whether a clear error of judgment was made." Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,
556 F.3d 177, 192 (4th Cir. 2009) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401
U.S. 402, 416 (1971)). "Deference is due where the agency has examined the relevant data and
provided an explanation of its decision that includes 'a rational connection between the facts
found and the choice made.'" Id. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mutual
Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

The APA also "includes 'the same kind of 'harmless-error' rule that courts ordinarily
apply in civil cases.'" Bechtel v. Admin. Review Bd., 710 F.3d 443, 449 (2d Cir. 2013) (quoting
Shinseki v. Saunders, 556 U.S. 396, 406 (2009)); see 5 U.S.C. § 706 ("[D]ue account shall be
taken of the rule of prejudicial error."). "As incorporated into the APA, the harmless error rule
requires the party asserting error to demonstrate prejudice from the error." Friends of Iwo Jima
v. Nat'l Capital Planning Comm'n, 176 F.3d 768, 774 (4th Cir. 1998) (quoting Air Canada v.
Dep't of Transp., 148 F.3d 1142, 1156 (D.C. Cir. 1998)). "If a party fails to carry that burden,
the agency's decision must be upheld." Id.

The Secretary of the Army, acting through the ABCMR, "may correct any military
record . . . when the Secretary considers it necessary to correct an error or remove an injustice."
10 U.S.C. § 1552(a)(1).[12]  Challenges to the ABCMR's decisions are considered under an
"unusually deferential application of the arbitrary or capricious standard of the APA." Cone v.
Caldera, 223 F.3d 789, 793 (D.C. Cir. 2000) (internal quotation marks omitted). Such deference
ensures that the courts function neither as a "super correction board," Charette v. Walker, 996 F.

---

[12] Specifically, this statute provides: "The Secretary of a military department may correct any
military record of the Secretary's department when the Secretary considers it necessary to correct
an error or remove an injustice. Except as provided in paragraph (2), such corrections shall be
made by the Secretary acting through boards of civilians of the executive part of that military
department." 10 U.S.C. § 1552(a)(1). The ABCMR constitutes the board of civilians acting on
behalf of the Secretary of the Department of the Army.

Supp. 43, 50 (D.D.C. 1998), nor as "a forum for appeals by every soldier dissatisfied with [a military personnel action or decision], a result that would destabilize military command and take the judiciary far afield of its area of competence." Cone, 223 F.3d at 793; see also Ferguson v. McHugh, --- F. Supp. 2d ---, 2014 WL 3973053, at *5 (D.D.C. Aug. 14, 2014) (noting that because the ABCMR is authorized to "correct records 'when the Secretary considers it necessary to correct an error or remove an injustice,'" judicial review of its determinations is necessarily "substantially restrict[ed]" (quoting 10 U.S.C. § 1552(a)(1)) (emphasis in original)). "The ABCMR begins its consideration of each case with the presumption of administrative regularity." Army Reg. 15-185 ¶ 2-9 (Mar. 31, 2006). To overcome this presumption, the applicant "has the burden of proving an error or injustice by a preponderance of the evidence." Id.

## B. **Discussion**

Counts I and II of the Amended Complaint challenge the ABCMR's decision under the APA. Specifically, Count I alleges that the ABCMR decision was arbitrary, capricious, and/or unsupported by substantial evidence, and Count II alleges that the decision "failed to address and correct" purported "due process violations" in the underlying Article 15 proceeding. Am. Compl. ¶¶ 227-43; see 5 U.S.C. § 706(2)(A)-(B), (E).

Although Downey has raised arguments challenging every aspect of the Board's decision, the primary issue presented is quite narrow: whether the ABCMR was justified in finding that Downey had not met his burden of proving an error or injustice and thereby denying his request to correct or remove the Article 15. The record of Downey's Article 15 stated that he was guilty of assault consummated by a battery for unlawfully striking Reuter "on his face with . . . a camera which [Downey] pushed into his face." AR 59. The Board found that the record evidence supported the conclusion that Downey had indeed unlawfully struck Reuter by pushing

a camera into his face.  AR 27-28.  Based on that finding, the Board concluded there was no error or injustice to correct.

The record reflects that the ABCMR's decision was supported by substantial evidence and that the Board's written opinion made a "rational connection" between that evidence and its conclusion.  Ohio Valley, 556 F.3d at 192 (quoting State Farm, 463 U.S. at 43).  Through counsel, Downey submitted to the Board a 30-page memorandum in support of removing the Article 15, and he enclosed over 150 pages of evidence, including some of the sworn testimony gathered by Schlimm during the investigation, Schlimm's report of his findings and recommendations, and an x-ray report regarding Reuter's injury that Downey had obtained after his Article 15 hearing.  In its written decision, the Board summarized its review of all the evidence before it.  AR 21-26.  This evidence included the verbatim testimony of numerous witnesses who all agreed that Downey intentionally made contact with the camera that Reuter was holding and that the force of Downey's contact caused the camera to hit Reuter's nose and caused Reuter to lose his balance.  See, e.g., AR 414 (testimony of Samantha Jones); AR 439 (testimony of Nicholas Wood); AR 517 (testimony of Dustin Tagliaboski); AR 526-27 (testimony of Thomas McHale II).  Most importantly, in Downey's sworn statement, he admits that he "pushed down" Reuter's camera and "[i]n the process, SPC Reuters [sic] camera struck him in the nose and as a result, he stumbled backwards to the floor and was somehow injured." AR 218.

Under the UCMJ, the offense of assault consummated by a battery is defined as the use of "unlawful force" to do "bodily harm" to another.  10 U.S.C. § 928.  The severity of the harm is immaterial so long as some amount of offensive contact occurs.  Manual for Courts-Martial, Pt. IV ¶ 54(c)(1)(a) (2012 ed.) ("'Bodily harm' means any offensive touching of another,

however slight."). Accordingly, Downey's own acknowledgement that he intentionally made contact with Reuter who then suffered injury "as a result" of his pushing the camera Reuter was holding into his face establishes that the "bodily harm" element was undeniably satisfied. That Downey later discovered that Reuter's nose had not been fractured does not alter that conclusion. It is uncontested that the camera hit Reuter's nose with sufficient force to cut the nose slightly causing it to bleed and that the injury appeared sufficiently serious to his colleagues to warrant them taking him to the emergency room. Moreover, his injury was severe enough that the medical professionals initially treating Reuter at the hospital believed his nose appeared to be fractured, AR 108-10, although further examination of his x-rays showed that not to be the case. The emergency care professionals also preliminarily diagnosed Reuter with a concussion, AR 108-10, and there is no evidence in the record that disproved that part of the diagnosis.

Similarly, there is more than substantial evidence in the record that the "unlawful force" element was satisfied. Force is unlawful if used "without legal justification or excuse and without the lawful consent of the person affected." Manual for Courts-Martial, Pt. IV ¶ 54(c)(1)(a). Unlawful force can occur through either an intentional or culpably negligent act or omission. Id. ¶ 54(c)(1)(b)(ii). Moreover, even if the use of force is justified or excused, using "more force than is required" constitutes an assault consummated by a battery. Id. ¶ 54(c)(2)(c). As Milley stated in a reprimand letter, Downey "had many alternative ways to address what [he] believed to be inappropriate conduct without assaulting a junior enlisted Solider under [his] command."[13] AR 13. As Downey's subordinate, Reuter would have been required to cease his photographing had Downey simply ordered him to do so. Plaintiff's contention that the music

---

[13] Milley withdrew this letter of reprimand before Downey appealed to FORSCOM, thereby rendering the record of the Article 15 itself as the only punishment following directly from the finding of guilt; however, Milley's statement accurately reflected that Downey could have used reasonable alternative methods.

was loud, leading him to think Reuter might not be able to hear him if he gave such an order is pure speculation. Moreover, the noise level would not have prevented Downey from stepping in front of Reuter to immediately prevent further photographing and to gain Reuter's attention. Downey also could have ordered the music stopped or ended the ball if he believed things were getting out of hand. Reuter's photography posed no threat of imminent harm to anyone at the ball. The lack of any imminent threat and the numerous peaceful alternatives available to Downey amount to substantial evidence that his immediate resort to physical force was unjustified and unlawful under the circumstances, even if he never intended to harm Reuter.

Downey argued before the ABCMR that injuring Reuter was accidental, which should excuse him from the assault charge. His accident defense was also properly rejected because there is no dispute that he intentionally made contact with the camera while Reuter was holding it in an attempt to stop what he assumed were inappropriate photographs from being taken. AR 218; Am. Compl. ¶ 60. Downey did not merely bump into the camera inadvertently. The offense of assault consummated by a battery does not require the offender to have the specific intent to harm the person against whom force is applied. Manual for Courts-Martial, Pt. IV ¶ 54(c)(1)(b)(ii) ("Specific intent to inflict bodily harm is not required."). Therefore, it is immaterial that Downey had not intended to harm Reuter. He purposely reached to lower the camera and, although he may have used more force than he intended, he is responsible for the reasonably foreseeable consequence that he would knock the camera into Reuter's face and cause Reuter to lose his balance and become injured. See United States v. Jenkins, 59 M.J. 893, 899 (Army Ct. Crim. App. 2004) ("[T]he accident defense does not excuse injury resulting from a deliberate act toward another if the natural and direct consequences of that act include injury."). The ABCMR considered the above evidence and arguments and reached the well-

supported conclusion that there was no error or injustice in the record of the Article 15

concluding that Downey was guilty of assault consummated by a battery.

Downey has argued that the decision of the Board failed to address all of the issues he

raised in his 30-page, single-spaced application. The Board was not required to address in

writing every argument attacking the Article 15 proceeding raised in that application because

none of those arguments could alter the outcome that there was clearly enough record evidence

to satisfy the two elements of the offense reflected in the Article 15.  In fact, "[e]ven when an

agency explains its decision with less than ideal clarity, a reviewing court will not upset the

decision on that account if the agency's path may reasonably be discerned." Nat'l Elec. Mfrs.

Ass'n v. U.S. Dep't of Energy, 654 F.3d 496, 514-15 (4th Cir. 2011) (internal citation omitted).

This approach is especially valid given the added deference due to military boards of correction.

Cone, 223 F.3d at 793.  Under this deferential standard, and given the substantial evidence

demonstrating that Downey's Article 15 record was not untrue or unjust, the ABCMR's decision

was not arbitrary, capricious, an abuse of discretion, or otherwise in violation of law.

None of Downey's other claims in Counts I and II alters this conclusion.  For example, in

Count II, Downey claims that the ABCMR failed to address and correct alleged due process

violations that occurred during his Article 15 proceeding, thereby rendering the Board's decision

contrary to applicable regulations.  Specifically, he complains that he was not found guilty

beyond a reasonable doubt; he was not given the opportunity to present a full defense to the

charges; exculpatory evidence, including the x-ray report showing Reuter did not have a

fractured nose, was not considered; and he was not given the notes of those who were present

during the Article 15 proceeding, which hindered his ability to appeal the findings.  Am. Compl.

¶¶ 237-43.

Contrary to Downey's contentions, the ABCMR found that the Article 15 proceeding was procedurally sufficient and "conducted in accordance with law." AR 28. Specifically, the Board found that Downey was provided an attorney with whom he consulted before having to decide whether to proceed with the Article 15 or elect trial by court-martial, and he was given the opportunity to demand a trial by court-martial. AR 28. He was also afforded the right to appeal the Article 15 findings to the next superior authority (FORSCOM), which appeal was denied, AR 28, and was able to defend himself during the Article 15 by submitting his own version of events in writing, calling witnesses, including Simbro and Justin Overholt, and submitting several letters of support demonstrating his good character, see Am. Compl. ¶¶ 164-65, 168-69. The investigating officer's failure to discover, and Milley's failure to consider, the x-ray report did not prejudice the outcome of the Article 15, given that bodily harm, "however slight," is all that is required under the UCMJ and there is no question that Reuter suffered at least some injury.[14] To the extent Downey complains that he was deprived of notes needed for his appeal, given that Downey was authorized to conduct Article 15 proceedings for his own subordinates, he was

---

[14] By the same reasoning, Downey's claims in Counts I, II, and III that the ABCMR failed to consider exculpatory evidence (the x-ray report regarding Reuter's nose) and that the Board's decision was based on incomplete and missing documents also fail. The only potentially missing document was the x-ray report reflecting that Reuter's nose had not been fractured. If Downey failed to submit this report to the ABCMR, then it was not an error of the Board to not consider it. See Ohio Valley Envtl. Coal., 556 F.3d at 201 ("[R]eview of agency action is typically limited to the administrative record that was available to the agency at the time of its decision . . . ." (citing Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam)). Even assuming Downey submitted this report and the ABCMR misplaced it, the Board's decision still would not have been different had it considered the report because its decision did not turn on the level of severity of Reuter's injury and there was more than substantial evidence in the record demonstrating that Reuter had suffered at least a "slight" injury.

Further, although Downey is correct that AR 207 states that "documents are missing," the document referenced by that notation is a character reference letter written on behalf of Downey by James L. Terry, which appears elsewhere in the record. See AR 205-08 (skipping from Enclosure 24 to Enclosure 26); AR 96 (indicating that Plaintiff's "Enclosure 25" to the ABCMR was the Terry letter); AR 264 (letter by Terry entitled "Character Reference").

aware that the only official record of the proceedings is the DA Form 2627.  Downey had a copy

of that form, as well as the documentary evidence from the investigation, which documents

enabled him to fully appeal the Article 15 findings.

Finally, in Count I, Downey complains that the Board applied the wrong standard of

review.  Rather than requiring him to prove that the record of his Article 15 was untrue or unjust

by a preponderance of the evidence, as is appropriate under Army Reg. 15-185 ¶ 2-9 (Mar. 31,

2006), the Board held him to a clear and convincing evidence standard, AR 26-27.  This was

harmless error as the Board found that there was "no evidence" of error or injustice.  AR 28.

Given the substantial evidence supporting his Article 15, Downey could not have met his burden

of proof even under the lower preponderance standard.  For these reasons, defendants' motion

for summary judgment on Counts I and II will be granted.

### III.   MOTION TO DISMISS COUNTS III AND IV

#### A. Standard of Review

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a complaint must allege facts

that "state a plausible claim for relief" and "are sufficient to raise a right to relief above the

speculative level." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012) (quoting Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

Although a plaintiff "need not forecast evidence sufficient to prove the elements of the claim,"

the complaint must "allege sufficient facts to establish those elements." Id. (quoting Robertson

v. Sea Pines Real Estate Cos., 679 F.3d 278, 291 (4th Cir. 2012)) (internal quotation marks

omitted).  Thus, "a formulaic recitation of the elements of a cause of action will not do."

Twombly, 550 U.S. at 555.

In evaluating whether a plaintiff has successfully "nudg[ed] [his] claims across the line

from conceivable to plausible," a court must "accept the truthfulness of all factual allegations,"

Burnette v. Fahey, 687 F.3d 171, 180 (4th Cir. 2012) (quoting Twombly, 550 U.S. at 555);

however, "the court need not accept the [plaintiff's] legal conclusions drawn from the facts, nor

need it accept as true unwarranted inferences, unreasonable conclusions, or arguments." Philips

v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (internal quotation marks omitted).

"Dismissal for failure to state a claim is proper where it is clear that no relief could be granted

under any set of facts that could be proved consistent with the allegations." Randall, 95 F.3d at

343 (internal quotation marks omitted).

Lastly, "[a]lthough as a general rule extrinsic evidence should not be considered at the

12(b)(6) stage, [the Fourth Circuit has] held that when a defendant attaches a document to its

motion to dismiss, a court may consider it in determining whether to dismiss the complaint [if] it

was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its

authenticity." Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir.

2004). Under this standard, the administrative record is deemed incorporated into Downey's

Amended Complaint because it is integral to this action and its authenticity is not at issue.[15]

## B. Discussion

In Count III, Downey claims that defendants' actions deprived him of his right to due

process based on alleged defects in how his Article 15 proceeding was conducted. Am. Compl.

¶¶ 246-55. In Count IV, he challenges the defendants' regulations, policies, and procedures,

claiming that they deprive an accused, including himself, the right to due process by failing to

allow access to notes and transcripts upon which to base an appeal; failing to provide a right to

---

[15] The Court's consideration of the administrative record in its review of the motion to dismiss is
especially appropriate given that Downey filed his Amended Complaint after defendants
submitted the administrative record. See Am. Chiropractic Ass'n, 367 F.3d at 234 ("[T]he
primary problem raised by looking to documents outside the complaint—lack of notice to the
plaintiff—is dissipated [w]here plaintiff has actual notice . . . and has relied upon these
documents in framing the complaint." (internal quotation marks omitted)).

counsel when waiving the right to a trial by court-martial; failing to provide a fair opportunity to be heard before the ABCMR; and denying liberty and property without due process. Am. Compl. ¶¶ 258-61. Defendants have moved to dismiss Counts III and IV on the ground that both counts raise non-justiciable issues and that, even if the issues were justiciable, these counts fail to state a claim because Downey has not pointed to any deprivation of a cognizable liberty or property interest.

Relying on the reasoning in Mindes v. Seaman, 453 F.2d 197 (5th Cir. 1971), which has been adopted by the Fourth Circuit, Downey contends that Counts III and IV are justiciable and that his allegations sufficiently satisfy the threshold pleading requirements to defeat dismissal. To avoid dismissal under the Mindes framework for determining whether a federal court should review an internal military decision, two threshold requirements must be satisfied. "First, there must be an 'allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations.'" Guerra v. Scruggs, 942 F.2d 270, 276 (4th Cir. 1991) (quoting Mindes, 453 F.2d at 201). "Second, the plaintiff must have exhausted the 'available intraservice corrective measures.'"[16] Id. (quoting Mindes, 453 F.2d at 201).

---

[16] If these two threshold requirements are met, then the court should use a four-part balancing test that weighs:

1. The nature and strength of the plaintiff's challenge to the military determination . . . .
2. The potential injury to the plaintiff if review is refused.
3. The type and degree of anticipated interference with the military function. Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.
4. The extent to which the exercise of military expertise or discretion is involved. Courts should defer to the superior knowledge and expertise of professionals in

Defendants characterize Counts III and IV as seeking direct review of the Article 15

proceeding in this Court and argue that such review is impermissible under Brannum v. Lake,

311 F.3d 1127 (D.C. Cir. 2002).  In Brannum, the plaintiff, an Air Force member charged with

being absent without leave, had chosen to proceed "by way of non-judicial punishment in lieu of

trial by court martial."  Id. at 1129.  He was found guilty of that charge and demoted one rank as

a result.  Id.  In his lawsuit, the plaintiff claimed, among other things, that his rights had been

violated by numerous procedural defects in his non-judicial punishment, such as his case having

been pre-judged and having been denied copies of the evidence used against him.  Id.  He sought

an injunction setting aside his non-judicial punishment.  Id.  The D.C. Circuit rejected this claim,

relying on Schlesinger v. Councilman, 420 U.S. 738 (1975), explaining that "[t]he acts of a court

martial, within the scope of its jurisdiction and duty, cannot be controlled or reviewed in the civil

courts, by writ of prohibition or otherwise."[17]  Id. at 1131 (quoting Schlesinger, 420 U.S. at 746).

---

matters such as promotions or orders directly related to specific military functions.

Guerra, 942 F.2d at 276 (quoting Mindes, 453 F.2d at 201-02).

[17] The Schlesinger Court further elaborated on the principle forbidding judicial interference with military decisions:

> Congress is empowered under Art. I, § 8, to "make Rules for the Government and Regulation of the land and naval Forces."  It has, however, never deemed it appropriate to confer on this Court appellate jurisdiction to supervise the administration of criminal justice in the military.  Nor has Congress conferred on any Art. III court jurisdiction directly to review court-martial determinations.  The valid, final judgments of military courts, like those of any court of competent jurisdiction not subject to direct review for errors of fact or law, have res judicata effect and preclude further litigation of the merits.  This Court therefore has adhered uniformly to the general rule that the acts of a court martial, within the scope of its jurisdiction and duty, cannot be controlled or reviewed in the civil courts, by writ of prohibition or otherwise.

Schlesinger, 420 U.S. at 746 (internal quotations marks, citations, and footnote omitted).  The Court went on to state that "it must be assumed that the military court system will vindicate servicemen's constitutional rights."  Id. at 758.

24

The court explained that this rule reflects "sensitivity to the special requirements of the military" and found that the rule "surely" applied to "challenges as well to non-judicial punishment offered in lieu of a court martial." Id.

Although Downey failed to distinguish or even address Brannum, other courts, including the Fourth Circuit, have not taken such a limited approach to reviewing non-judicial proceedings under Article 15 and instead will consider claims solely alleging procedural defects. See, e.g., Murphy v. United States, 993 F.2d 871, 873 (Fed. Cir. 1993) ("A court may appropriately decide whether the military followed procedures . . . ."); Bluth v. Laird, 435 F.2d 1065, 1071 (4th Cir. 1970) ("[N]either this Court, nor others to which a similar issue has been presented, has evidenced hesitation in directing the military to comply with its own regulations where it has been shown that a regulation was not followed, and there has been a prima facie showing that a member of the military has been prejudiced thereby."); Sobczak v. United States, 93 Fed. Cl. 625, 632-36 (2010) (addressing veteran's claims that his procedural rights were violated by the United States Marine Corps' failure to follow applicable regulations regarding his non-judicial punishment), aff'd, 415 F. App'x 247 (Fed. Cir. 2011). Given this authority, the Court will address Downey's claims that Milley failed to follow certain Army Regulations in conducting the hearing and thereby deprived him of the limited procedural rights to which he was entitled. Specifically, in Count III, Downey claims he: was denied the ability to present a full defense to the charges in violation of Army Reg. 27-10 ¶ 3-18(e) (Oct. 3, 2011); was not afforded the presumption of innocence and was found guilty on less than a beyond a reasonable doubt in violation of Army Reg. 27-10 ¶ 3-18(l) (Oct. 3, 2011); and was denied the ability to collect and proffer evidence and witness testimony in his favor. He also claims that his election of non-judicial punishment was not made knowingly and voluntarily.

The factual allegations underlying Count III do not plausibly support any of these procedural claims, particularly in light of the evidence in the administrative record. See Am. Compl. ¶¶ 142-81 (describing Downey's Article 15 proceeding). Downey was in fact able to call witnesses and present evidence, as both Justin Overholt and Simbro testified in his favor. Id. ¶¶ 164-65. As the unit's physician assistant, Overholt had performed a follow-up examination of Reuter within 36 hours of his trip to the emergency room and, based on that examination, he believed that Reuter's nose was not fractured. AR 66; Am. Compl. ¶¶ 123-26. Although Downey alleges that Milley disregarded these witnesses' testimony, id. ¶¶ 164-65, Milley had the authority as the decision maker and fact finder to afford each witness's testimony as much or as little weight as he saw fit. In contrast to his claims that he did not have a reasonable opportunity to speak or defend himself or to present evidence, Downey did speak on his own behalf at the hearing and also submitted multiple letters of support and a sworn written statement providing his version of events and his reasons for taking the actions he did.[18] AR 217-21; Am. Compl. ¶ 166, 168-69. Tellingly, Downey does not identify which witnesses he was prevented from calling and how such testimony would have advanced his defense.[19] Downey's claims that the evidence did not support a finding of guilt beyond a reasonable doubt and that he was not afforded a presumption of innocence are conclusory and not supported by factual allegations. Moreover, there was more than enough evidence in the record for Milley to find Downey guilty beyond a reasonable doubt of assault consummated by a battery.

---

[18] Although this claim is vague, it appears Downey's main complaint is that he was not permitted to fully elaborate on his accident defense, his reasons behind his actions, and his argument that his use of force was lawful, AR 87-88, 91, 93; however, Downey did explain his accident defense, intentions, and argument that his use of force was lawful in his sworn statement and to the investigating officer, who credited Downey's claim that he had not meant to harm Reuter. AR 333.

[19] Downey alleges that Milley did not call Reuter, Am. Compl. ¶ 173; however, Downey does not allege that he asked to call Reuter.

Downey further claims that his election of non-judicial punishment and his waiver of the right to counsel were not knowing, voluntary, and intelligent. There is no basis in the record supporting these claims. "Article 15 is an 'administrative method of dealing with the most minor offenses,' thus, the fifth and sixth amendment rights applicable to criminal proceedings do not apply to Article 15 proceedings." Dumas v. United States, 620 F.2d 247, 252 (Ct. Cl. 1980) (quoting Middendorf, 425 U.S. at 31-32). Army Regulations do provide the right to have a spokesperson present during an Article 15 who may be an attorney; however, Downey chose not to exercise this right. Downey also claims that his election of non-judicial punishment was not knowing, voluntary, and intelligent because the waiver was conducted without his counsel's presence. Pl.'s Opp'n 37. This argument is meritless. Downey had the right to consult with counsel, and did consult with appointed military counsel, before going into the hearing at which he chose to waive trial by court-martial. His decision not to bring his military counsel with him into the hearing as his spokesperson does not constitute a violation of any rights. Moreover, it is completely implausible that Downey, as a Lieutenant Colonel and squadron commander authorized to administer non-judicial punishment to his subordinates, was unaware of the contours of the Article 15 proceeding he was choosing.

Finally, Downey claims that he was denied access to notes of others who were at the Article 15 hearing. Downey points to no regulation requiring such access. Moreover, as non-adversarial, non-judicial proceedings, Article 15 proceedings are not transcribed or recorded; the only record of the proceeding is the DA Form 2627, which Downey received. See Army Reg. 27-10 ¶¶ 3-36 to 3-37 (Oct. 3, 2011).

The above analysis comports with the Mindes framework for determining whether a court should review a military decision. Downey's claims in Counts III and IV fail the first threshold

requirement that "there must be an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations." Guerra, 942 F.2d at 276 (internal quotation marks omitted).  The Count III claims alleging violations of Army Regulations are unsupported and implausible in light of the allegations in the Amended Complaint and the record evidence showing that the regulations cited were in fact followed.

In Count IV, Downey claims that the regulations, policies, and procedures themselves violated his constitutional right to due process.  To state a procedural due process claim, a plaintiff must plausibly allege an actual deprivation of a protected liberty or property interest. Kendall v. Balcerzak, 650 F.3d 515, 528 (4th Cir. 2011).  Downey has failed to do so.  Downey was neither discharged nor demoted; instead, the only actual deprivations Downey experienced were being removed from the National War College ("NWC") attendance list, being relieved from command, and his stigmatization as an assaulter.  Pl.'s Opp'n 39.  The first two deprivations are insufficient to support a due process claim because there is no protected liberty or property interest in NWC attendance or a command position.  C.f. Wilhelm v. Caldera, 90 F. Supp. 2d 3, 8 (D.D.C. 2000) (collecting cases holding that there is no right to continued military service or its attendant benefits and privileges), aff'd, 6 F. App'x 3 (D.C. Cir. 2001).  Similarly, Downey's allegation of being stigmatized does not satisfy the requirements for showing that he was deprived of a protected liberty interest in his good name and reputation.  See Guerra, 942 F.2d at 278 ("A critical element of a claimed invasion of a reputational liberty interest . . . is the falsity of the government's asserted basis for the employment decision at issue." (emphasis in original)).

## IV.    UNLAWFUL COMMAND INFLUENCE

In both Counts II and III, Downey raises claims regarding unlawful command influence ("UCI") based on concerns over the adverse media attention the incidents at the ball garnered in the wake of the repeal of DADT.  Specifically, Downey claims that UCI tainted the Article 15 investigation and hearing and also tainted "[a]ll proceedings concerning" him, presumably including the ABCMR's decision.[20]  See Am. Compl. ¶¶ 240, 250, 252; see also 10 U.S.C. § 837 (prohibiting UCI).  In his application to the Board, Downey pointed to a Department of Defense press release indicating that the repeal of DADT was being implemented successfully, AR 84; however, he did not allege that either of the two high-level officials quoted in the press release made any efforts to influence his Article 15 proceeding.  Such statements to the media by high-level officials unconnected to the proceeding at issue are far too speculative to constitute UCI. See, e.g., United States v. Ashby, 68 M.J. 108, 128-29 (C.A.A.F. 2009).  Downey also pointed to an article published online by the Huffington Post on April 20, 2012, AR 85-86, which described Robinson's perspective of the events of the ball but did not name any individuals or even specify the military base on which the ball was held.  AR 252-53.  Moreover, Downey has conceded that "there [was] no express evidence of bias by the presiding Article 15 Officer."  AR 86.  Any claim of UCI also ignores Milley's dismissal of the second charge and acquittal of Downey on the third charge.

---

[20] The only UCI claim in Count II states, "The investigations and findings against LTC Downey were tainted by unlawful command influence."  Am. Compl. ¶ 240.  Because Count II is framed as an attack on the ABCMR's decision rather than as a direct attack on the Article 15, plaintiff seemingly intended to claim that the ABCMR's failure to specifically address his UCI allegations rendered its decision unlawful under APA standards.

Lastly, Downey referenced for the first time in this litigation a September 2012 New York Times article[21] about the status of gay service members one year after the repeal of DADT and a clip from a television interview[22] of Robinson that was published in June 2014. Because the New York Times article was not part of the record before the ABCMR, it will not be considered.[23] See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). Moreover, the statements contained in the New York Times article and interview clip do not plausibly imply that Milley or the ABCMR were unlawfully influenced to reach an improper decision. In sum, Downey has not alleged facts which, even if true, would have constituted unlawful command influence in either his Article 15 or the ABCMR proceeding. This conclusion with respect to the ABCMR proceeding is bolstered by the Board being composed of civilians not within any military chain of command.

For these reasons, Downey's UCI claims fail under both the summary judgment and motion to dismiss standards of review.

---

[21] Specifically, Downey emphasizes the article's paraphrased statement by a member of an LGBT veteran advocacy group that "after the female officers [Robinson and Parsons] contacted his organization, the Pentagon investigated and the squadron commander and the sergeant major were relieved of their jobs and forced to retire." See Pl.'s Opp'n, Ex. 2 (New York Times article entitled One Year Later, Military Says Gay Policy Is Working, available at http://www.nytimes.com/2012/09/20/us/dont-ask-dont-tell-anniversary-passes-with-little-note.html?_r=0).

[22] Pl.'s Opp'n, Ex. 3 (TakePart Live, Openly Gay in The Military?, (June 12, 2014), https://www.youtube.com/watch?v=yVibI6PzJ6I).

[23] Although Downey argues that he is entitled to present this article as new evidence because it was not available when he petitioned the ABCMR, see Pl.'s Reply 18, the article is dated September 19, 2012, which predates his August 16, 2013, application to the ABCMR.

## V.    CONCLUSION

As summarized in seven pages in his Amended Complaint, Downey had an exemplary military record before the events in April 2012. He served three combat tours of duty and earned three Bronze Stars and seven Air Medals, including an Air Medal with a distinction for valor in combat. Am. Compl. ¶¶ 14-15, 22. In addition, he was selected to serve as the Presidential Airlift Coordinator for the White House between 2008 and 2010; held various command positions during his career; received consistently exemplary OERs; and received numerous glowing evaluations by commanding officers. See Am. Compl. ¶¶ 18-21, 23-24, 26, 30.

That record is not relevant to the issues before this Court. As discussed above, the informal Article 15 proceeding that Downey knowingly and voluntarily chose was conducted properly, and the ABCMR's affirmance of that proceeding was neither arbitrary, capricious, contrary to law, nor unsupported by substantial evidence. Moreover, Downey was not denied due process because the process he was due was in fact followed and he was not deprived of any constitutionally recognized liberty or property interest. For these reasons, the defendants' motions to dismiss and for summary judgment will be granted by an Order to be issued with this Memorandum Opinion.

Entered this 19 day of June, 2015.

Alexandria, Virginia

                                                                          /s/
                                                                   Leonie M. Brinkema
                                                                   United States District Judge